## BROWN *v.* STATE.*

(Division B.   Feb. 6, 1928.)

[115 So. 433.   No. 26506.]

1. HOMICIDE.  *In absence of conspiracy, act of one causing death is not chargeable to others, unless they aided or abetted.*

    There being no evidence of conspiracy, the act of one of party in bringing about the death of the deceased cannot be chargeable to the others, unless during the fray they aided or abetted in the act which caused the death.

2. HOMICIDE.  *Evidence held sufficient for jury that others than the one striking fatal blow aided and abetted.*

    Evidence that all of the B.'s, including defendant, were the aggressors in the fray in which S. was killed by defendant's son, that they pursued S. for some distance, shooting at him, that during the pursuit he was stabbed by one or more of the B.'s, and that they were all present when he was killed, the fray not ending till then, *held* sufficient to go to the jury on the question whether he aided or abetted in the commission of the act which caused the death.

3. CRIMINAL LAW.  *Instruction submitting issue of killing by defendant without evidence thereof held error.*

    It was error to submit the issue of defendant having killed deceased, when there was no evidence of his having struck the blow that caused the death.

4. HOMICIDE.  *Instruction that if defendant "caused" another to kill deceased he was guilty of manslaughter held error, where he merely said, "Don't let him [deceased] kill me."*

    Where when deceased had defendant down, beating him, defendant exclaimed, "For God's sake, don't let him kill me!" whereupon defendant's son in response killed deceased, an instruction that defendant was guilty of manslaughter if he "caused" another to kill deceased was erroneous; causing a crime to be committed not being aiding and abetting in its commission.

*Corpus Juris-Cyc. References: Criminal Law, 16CJ, p. 1043, n. 37; Homicide, 30CJ, p. 301, n. 8, 9; p. 333, n. 49; p. 337, n. 87; p. 394, n. 5; As to effect of homicide resulting from injuries by different persons acting independently, see annotation in 67 L. R. A. 426; 13 R. C. L. 724.

APPEAL from circuit court of Lauderdale county.

HON. J. D. FATHEREE, Judge.

Clyde Brown was convicted of manslaughter, and he appeals. Reversed and remanded.

*Reily & Parker,* for appellant.

The testimony is wholly insufficient to sustain the verdict of the jury in this case, and the trial court erred in not granting a peremptory instruction for the defendant. In order for the defendant to be guilty of manslaughter in this case, it was necessary for the state to show beyond a reasonable doubt that the defendant actually killed the deceased in violation of law; or that the deceased was killed unlawfully by one of the party of which the defendant was a member, and that the killing was the result of a conspiracy by this party; or that another unlawfully killed the deceased and the defendant aided and abetted in this killing. That Smith was killed by some or all of the party of which Clyde Brown was a member, is not sufficient to prove that he was actually killed by Clyde Brown; and the fact that Clyde Brown had been or was in an actual fight with the deceased, does not prove that Clyde Brown did the killing. 30 C. J. 301; 29 C. J. 1078; *Walker* v. *State* (Ga.), 67 L. R. A. 426; 29 C. J. 1072; *Campbell* v. *People,* 61 Am. Dec. 49; *McGehee et al.* v. *State,* 104 So. 150; *Patty* v. *State,* 88 So. 498; *Houston* v. *State,* 78 So. 182; *Rich* v. *State,* 86 So. 770; *Harper* v. *State,* 35 So. 572; *McGehee* v. *State,* 104 So. 150; *Bibby* v. *State,* 65 S. W. 193; *Books* v. *State,* 12 L. R. A. (N. S.) 889; *Sullivan* v. *State,* 37 So. 1006; *People* v. *Lewis,* 45 L. R. A. 783.

We think the instruction given by the court is error in submitting to the jury the right to convict the appellant on the theory that the appellant had killed the deceased; there being no evidence on which to base this instruction. To authorize the jury to return a verdict based on a theory on which there is no testimony is error. *Lee* v. *State,*

103 So. 233; *Harper* v. *State,* 35 So. 572; *Sullivan* v. *State,* 37 So. 1006; *Rich* v. *State,* 86 So. 770.

We think the latter part of this instruction is fatally erroneous, wherein it authorizes a conviction of the appellant on that state of facts showing another person to have killed the deceased, if the appellant "caused another to so kill the deceased." The legal requirement of aiding or abetting consists in the participating in crime to a greater extent than just being an innocent agency or part of the operation. There is a vast difference in aiding or abetting a crime and causing a crime. A person has caused a crime when he or his actions are the producing element in its inception, and this may be much less than aiding or abetting. *Hicks* v. *U. S.,* 37 L. Ed., 1137; *Brabson* v. *State,* 8 So. 326; *Smith* v. *State,* 91 So. 41; *Woolweaver* v. *State,* 40 Am. S. R. 667.

*J. A. Lauderdale,* Assistant Attorney-General, for appellee.

As to sufficiency of the testimony see *McCoy* v. *The State,* 91 Miss. 257. The law is well settled in this state, in fact, it is fixed by statute that anyone who aids, abets, encourages, or incites the commission of a crime is guilty as principal. Sec. 787, Hem. Code 1927; *Biley* v. *State,* 143 Miss. 210; *Fleming* v. *State,* 142 Miss. 872; *Wynn* v. *State,* 63 Miss. 260.

Counsel for appellant contend that the instruction complained of is erroneous because there is no testimony to support an instruction defining manslaughter. I think that the proof in this record is ample to sustain this instruction. However, if I am mistaken in this, under the holding of the court in *Blalock* v. *State,* 113 So. 627, and cases there cited, the granting of this instruction was not erroneous.

The most serious contention about this instruction is found in the second clause in that it used the language:

"That he caused another to so kill the deceased at the time when he was present." This instruction would have been more apt had it used the words: "That he aided, abetted, or encouraged another so to kill the deceased at a time when he was present." However, I think the word "cause" is a stronger word than aid, abet, or encourage. Webster's New International Dictionary; *State* v. *King*, 58 S. E. 937. The instruction required that the jury believe that the defendant caused another to so kill deceased, that is, that the killing be manslaughter.

Argued orally by *Marion W. Reily,* for appellant, and *J. A. Lauderdale,* Assistant Attorney-General, for appellee.

ANDERSON, J., delivered the opinion of the court.

Appellant, Clyde Brown, was indicted in the circuit court of Lauderdale county, jointly with Vernon Brown, Reon Brown, and Rufus Brown, of the murder of Joe Smith. There was a severance, and the trial of appellant resulted in a conviction of manslaughter. From that judgment appellant prosecutes this appeal.

On the 6th day of December, 1926, Joe Smith was found dead on a neighborhood road near where he lived with his family. He had been stabbed with a knife, shot with a gun, and his skull crushed with a blunt instrument. The evidence showed that the immediate cause of his death was the latter wound.

Smith's home was on a neighborhood road about one-half mile from the main macadamized highway leading north from Meridian. His body was found about eight o'clock at night on the 6th of December, 1926, near the intersection of the neighborhood road and the macadamized highway. He was killed in the nighttime.

The widow of the deceased testified that about seven o'clock on the morning of the day of the homicide appellant, his son, Vernon Brown, and the other two Browns with whom appellant was jointly indicted, came to her home and inquired for her husband, and she told them he was not at home.; that again, about four o'clock in the afternoon of the same day, they returned and inquired for her husband, and she told them he was not at home; that they stated that they would be back shortly afterwards to see him; that they did come back, about six o'clock in the afternoon of the same day and inquired if her husband had returned home, and she informed them that he had not; that they requested her sixteen-year-old son, Minton Smith, to go with them, stating that they were going to start a graveyard with Ben Larkin, a negro, who lived near, but that her son refused to accompany them; that they thereupon left, going in the direction of the home of the negro, Larkin, which was about a quarter of a mile away from her home; that the Browns stopped their car on the road leading from the Smith home to the main highway. She testified that in about twenty minutes after they left her home she heard five shots: Two in close succession, then a short interval; another shot, another interval; and then other shots.

Mrs. Smith testified that on the day of the homicide her husband left home about seven-thirty in the morning for Meridian, and that she expected him to return about five o'clock that afternoon; that about twelve o'clock that night she learned that her husband had been killed.

There were no eyewitnesses to the homicide, except the four Browns.

J. V. Forman testified that he saw the beginning of the fray which led up to the killing of Smith; that he was in Meridian on the day Smith was killed; that he left Meridian with Smith, on Smith's truck, for his home north of Meridian; that about two hundred fifty yards from the main highway, on the neighborhood road leading to Smith's home, he and Smith were stopped by the

Browns; that appellant, Clyde Brown, said "I am going to kill a negro tonight;" that Smith got off of his truck, and that he and three of the Browns went up the road toward the home of the negro, Larkin; that one of the Browns remained with the witness Florman at Smith's truck, detaining Forman there while Smith and the other Browns went to the home of the negro, Larkin; that in fifteen or twenty minutes after the three Browns left for the home of the negro, Larkin, they, with Smith, returned to Smith's truck; that when they returned Smith had a shotgun; that appellant walked up to Smith, and said "Give me that gun, Joe;" that Smith handed him the gun, then walked behind the truck; that shortly thereafter Smith said, "Don't cut me," and the appellant said, "Shoot him;" that Smith then ran from the truck toward the main highway, the four Browns running after him; that when they were about one hundred feet away from the truck a gun was fired once or twice; and that later there were other gunshots.

The witness Forman testified further:

"A.   And was gone about fifteen or twenty minutes, the three of them.   There was Mr. Clyde, Mr. Rufe, and one of the boys went with Mr. Joe Smith, and one of them stayed there with me, and I told them before they left there, told them fellows I got to go home.   Clyde said, 'No, you are going to stay right here.'   I didn't get off the truck or go on with the truck, but stayed there.

"Q.   Who stayed there with you?   A.   I don't know the boy's name.

"Q.   One of the boys?   A.   Yes, sir.

"Q.   And who left there together?   Who all left there together?   A.   Mr. Joe Smith and Mr. Clyde and Mr. Rufe and one of the boys.

"Q.   Do you know what happened there when they went away?   A.   No, sir.

"Q.   You don't know about that?   A.   No, sir; I don't know what happened.   I didn't for about fifteen or twenty minutes.   In about fifteen or twenty minutes Mr. Clyde

and Mr. Rufe and the boy came back just a little ahead of Mr. Joe, and Mr. Joe had a single-barrel shotgun, and Mr. Clyde walked out there, as he walked up and said, 'Give me the gun, Joe,' and he handed him the gun, a single-barrel shotgun, and he walked behind the truck, right on the right side of my truck and got back of the trailer, and Mr. Joe Smith said, 'Don't cut me,' and Mr. Clyde said, 'Shoot him.'

"Q. Do you know who Mr. Joe Smith was talking to? A. No, sir; I don't know who he was talking to.

"Q. Well, when Mr. Joe Smith said, 'Don't shoot me,' and Mr. Clyde—when Joe Smith said, 'Don't cut me,' and Mr. Clyde Brown said, 'Shoot him,' what happened? A. They run.

"Q. Who run? A. Mr. Joe Smith run, and they run after him.

"Q. You say 'they.' Who ran after him? A. Mr. Clyde Brown, Mr. Rufe Brown, and the two boys.

"Q. Which way did they go? A. Going towards the gravel road. Towards the gravel road.

"Q. Down that little road your truck went over? A. Yes, sir.

"Q. What did you do? A. I run.

"Q. You ran? A. Yes, sir; when the gun fired I run.

"Q. When the gun fired you ran? A. Yes, sir.

"Q. Where was the person standing that fired the gun? A. Well, it looked to be, I suppose, about one hundred feet from the truck. Maybe further.

"Q. Towards the gravel road? A. Yes, sir.

"Q. Where did you go? A. I went across the pasture back of Mr. Key's house.

"Q. Did you hear any more shooting? A. I heard about three or five shots.

"Q. Three or five shots? A. Yes, sir."

Frank Gunn, W. P. Shannon, and Pat Allen, police officers of the city of Meridian, testified, in substance, that a few hours after Smith was killed, appellant and

Rufus Brown came to the police office in Meridian; that appellant stated that he and the other Browns were together up near the home of the negro, Ben Larkin, trying to locate some chickens that had been stolen from one of the Browns; that Joe Smith came along, and they got into an altercation and a fight with him; that Smith got appellant down during the fight, but appellant got up and ran away from Smith; that Smith caught appellant and got him down again, and that appellant hallooed, ''For God's sake, don't let him kill me;'' that thereupon appellant's son, Vernon Brown, shot Smith, and struck him over the head with a gun; that they left Smith there, not knowing whether he was dead or not. These police officers testified that on being informed that Smith was dead appellant stated that his son, Vernon, killed him.

Dr. D. L. Walker testified that he examined Smith's body the next day after he was killed; that Smith had been cut, shot, and his skull crushed in with a blunt weapon; that his skull had been crushed by one or more blows. On direct examination, Dr. Walker testified that all of these wounds were capable of being contributory causes to Smith's death. But, on cross-examination, he stated positively that the crushing of Smith's skull with the blunt instrument alone was the cause of his death.

Cannady, the sheriff of Lauderdale county, testified that shortly after the homicide he went to the place where it occurred; that Smith's truck was on a neighborhood road, about two hundred fifty yards from the main highway; that he found some blood at or near Smith's truck; that a trail of blood could be followed from the truck to where Smith's body was found; that at one place, about one hundred fifty yards from where the body was found, and between there and Smith's truck, there was a pool of blood, and an impression in the soft dirt indicating that a man had fallen on his elbow; that Smith's hat was found with a cut in it; that Smith's head had been crushed with a blunt instrument, and

that his body also showed gunshot wounds and stabs; that he searched the ground, and found no weapon of any description; that he examined the person of appellant on the night Smith was killed; that appellant was stripped; that he did not find any cuts or bruises upon his person; that appellant made no complaint at the time that he had received any wound at the hands of Smith.

Appellant assigns and argues as error the action of the court in refusing to direct a verdict in his favor.

According to the evidence, the blow that crushed the skull of the deceased, Smith, caused his death. And the evidence showed that appellant's son, Vernon Brown, and not appellant, wielded the instrument which crushed the skull of the deceased. There was not sufficient evidence to go to the jury of a conspiracy between appellant, his son Vernon, and the other Browns, to take the life of the deceased, or do him some great bodily harm, and that in pursuance of such conspiracy the deceased lost his life. Therefore the act of one of the Browns in bringing about the death of the deceased cannot be chargeable to the others, unless during the fray the others aided or abetted in the act which caused the death of the deceased. The law is, as contended by appellant, that when a killing takes place in the course of a joint affray, in the absence of a conspiracy, it must be shown, in order to convict the defendant, that he struck the fatal blow, or aided or abetted therein. 30 C. J. 301. But we think there was sufficient evidence to go to the jury tending to show that, although the fatal blow which caused the death of Smith was not struck by the appellant, he aided and abetted therein. The testimony of Forman tended to show that all the Browns, including appellant, were the aggressors in the affray; that they pursued Smith for some distance, shooting at him. There was other evidence tending to show that during the pursuit Smith was stabbed by one or more of the Browns, and from such wounds bled as he ran. When Smith's skull

was crushed by the blow from Vernon Brown, the son of the appellant, the appellant and the other Browns were all present. Forman's evidence tended to show that from the time Smith fled from his truck pursued by the Browns, the fray did not end until Smith was killed. The evidence therefore was ample to go to the jury on the question as to whether appellant aided or abetted in the commission of the act which caused Smith's death. The trial court did not err in refusing to direct a verdict of not guilty.

Appellant complains of the action of the court in giving the following instruction for the state:

"That if you believe from the evidence beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis, that the defendant killed the deceased in a heat of passion, without malice by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, he is guilty of manslaughter; or if you believe from the evidence beyond a reasonable doubt, and to the exclusion of every other reasonable hypothesis, that he caused another to so kill the deceased at a time when he was present, then it will be your duty to convict the defendant of manslaughter."

This was the only manslaughter instruction given, either for the state or appellant. As stated, appellant was convicted of manslaughter. We are of opinion that the instruction is erroneous in two respects: (1) In the first clause of the instruction the jury were told that if they believed from the evidence beyond a reasonable doubt that *appellant killed the deceased* in the heat of passion, without malice, by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, he was guilty of manslaughter. The fault in that clause of the instruction is that there was no evidence that appellant struck the blow that killed Smith. Apparently the instruction submitted that question to the jury; and (2) the last clause of the instruction is erroneous in that it informed the jury that if they be-

lieved beyond a reasonable doubt that appellant caused another in the heat of passion, without malice, by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, to kill the deceased, the jury should find appellant guilty of manslaughter.

The language of an instruction should be given its ordinary and popular understanding. In the sense of the law, the causing of a crime to be committed is a very different thing from aiding and abetting in the commission of a crime.

The evidence showed that Smith had appellant down, beating him, but there was no evidence that in doing so he used a dangerous weapon; that appellant hallooed, "For God's sake, don't let him kill me;" that thereupon appellant's son, Vernon Brown, shot Smith, and struck the blow that caused the latter's death. One may cause the death of another without any such intent. In *Smith* v. *State* (Miss.), 91 So. 41, which was a charge of assault and battery with intent to kill and murder, where the evidence for the state showed that the wife shot and wounded the injured person upon the command of the defendant, her husband, the court held that an instruction for the state was erroneous which failed to inform the jury that when the defendant called upon his wife to shoot, he must have had the intent with malice aforethought to kill. In *Brabston* v. *State,* 68 Miss. 208, 8 So. 326, the court held that where there was no evidence that the conflict resulting in the death of the deceased was brought about in pursuance of a conspiracy, it was error to instruct the jury that:

If "defendant voluntarily brought on a difficulty or shooting with deceased, and thereby caused other persons to take part in the unlawful affray in which deceased was killed, the defendant was guilty of murder, although he may not have fired the fatal shot."

In *Sullivan* v. *State,* 85 Miss. 149, 37 So. 1006, the following language from *Woolweaver* v. *State,* 50 Ohio

St. 277, 34 N. E. 352, 40 Am. St. Rep. 667, was quoted by the court with approval:

"Whenever a father engages in a fight, the tendency of that act is to incite a son, who may be standing by, to acts of violence, either toward the immediate antagonist of the father, should there be one, or toward the party of that antagonist, if there should be more than one. This tendency may be affirmed in respect to many other ties of kindred, or in many instances of merely close companionship. What rash or violent act the by-standing son, kinsman, or comrade may be moved to do, depends in a great measure upon the quality of his temper, the strength of his affection, and the notion, often mistaken, that he may hastily gather under the excitement of the moment, as to who is in fault and to be held responsible for bringing on the conflict. And if the by-standing son, other kinsman, or comrade should, of his own volition, by an independent act of violence, slay the antagonist, the party engaged in the fight should not be charged with this act merely because he was engaged in a conflict with the deceased, and in that way, but in that way only, incited the fatal act. This is not enough to show a criminal intention; something more must appear. He must have purposely incited or encouraged the party in that course of violence that led to the homicide, or done some overt act himself with a view to that result, and that in some degree contributed thereto."

When Smith had appellant down, the latter did not call on anyone to kill Smith, or do him some great bodily harm. He only exclaimed, "For God's sake, don't let him kill me!" Thereupon appellant's son, Vernon Brown, shot Smith, and wielded the blow that caused his death. The jury were authorized by this clause of the instruction to find appellant guilty if his son, Vernon Brown, killed Smith in obedience to that exclamation on the part of appellant. It directed the minds of the jury to that particular part of the fray disconnected from the

balance of it. We think the instruction in that respect was harmful to appellant, and is, therefore, reversible error.

We think the other alleged errors argued by appellant are without merit.

*Reversed and remanded.*

ETHRIDGE, P. J., disqualified, took no part.